UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| AKHIL GUPTA, <br>     Plaintiff, <br><br>     v. <br><br> JOHNSON & WALES UNIVERSITY, <br>     Defendant. | No. 25-cv-533-JJM-AEM |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Akhil Gupta has filed a seventeen-count Complaint against his former employer, Johnson & Wales University ("JWU" or "the University"), alleging that JWU retaliated against him and subjected him to discrimination on account of his race, color, national origin, sex, and age.  ECF No. 1.  JWU now moves to dismiss Mr. Gupta's Complaint.  ECF No. 6.  For the reasons that follow, the Court GRANTS IN PART and DENIES IN PART JWU's Motion to Dismiss.

## I.   BACKGROUND[1]

Mr. Gupta is a male person of color who is of Indian national origin and who is over the age of forty.  ECF No. 1 at 2.  JWU hired Mr. Gupta in 2004, and he worked in various roles throughout his twenty-year career at the University.  *Id.*  In or about December 2019, Mr. Gupta was promoted from his role as Chief Information Officer

---

[1] The following facts are drawn from Mr. Gupta's Complaint and are taken as true for the purposes of the present Motion to Dismiss.

("CIO") to Vice-President of Enrollment Management ("VPEM"). *Id.* at 2-3. Mr. Gupta alleges that, around the time of his promotion, the President of JWU, Marie Bernardo-Sousa, told the Chancellor of JWU, Mim Runey, that "she was concerned about putting [Mr. Gupta] in this position as a male in the '#Me Too' movement," and that "Indian men do not respect women." *Id.* at 3. Mr. Gupta claims that Ms. Runey later told him about these statements being made about him. *Id.*

In his new role as VPEM, Mr. Gupta was responsible for student enrollment at JWU, including its Undergraduate, Graduate, and International programs. *Id.* at 4. Mr. Gupta was also charged with supervising hundreds of employees, managing a multi-million-dollar budget, and overseeing a key revenue stream for the University. *Id.* at 2-4. Though Mr. Gupta did not have prior experience in Enrollment Management ("EM"), JWU selected him for this role in an effort to turn around an underperforming department. *Id.* at 3. Before 2022, JWU's enrollment numbers were steadily declining. *Id.* at 4. However, in Fall 2022, Mr. Gupta's department "delivered the best performance against JWU's goals in years," and, in Fall 2023, "Gupta's team delivered the first year of enrollment *growth* since 2016 and the largest enrollment growth since 2011." *Id.* (emphasis in original).

In early 2023, Mr. Gupta hired Meredith Twombly, "a white, American female who is substantially younger than [Mr.] Gupta," to serve as Associate Vice President of EM and his "second in command." *Id.* at 5. Mr. Gupta primarily tasked Ms. Twombly with leading marketing efforts to increase Fall 2024 enrollment numbers among JWU's non-culinary programs. *Id.* at 6. Another member of Mr. Gupta's team,

2

Cristina Torres, was charged with leading similar efforts to increase Fall 2024 enrollment numbers for JWU's culinary program. *Id.*

As September 2023 approached, Mr. Gupta met with Ms. Twombly because he worried that the Fall 2024 enrollment numbers for JWU's non-culinary programs "were not looking as good as expected," as compared to the enrollment numbers Ms. Torres was achieving for the culinary program. *Id.* Despite the overall success of the Fall 2023 enrollment cycle, Mr. Gupta told Ms. Twombly that JWU's enrollment numbers for its International and Graduate programs during that same period had been "disappointing." *Id.* As such, Mr. Gupta asked Ms. Twombly to develop plans to address "the mediocre performance in International and Graduate Enrollment." *Id.*

Between September and October 2023, Mr. Gupta met several more times with Ms. Twombly to discuss the results of her marketing initiatives and what he viewed as "worrisome indicators" for the Fall 2024 enrollment cycle. *Id.* At these meetings, Mr. Gupta pointed out these "disappointing results" to Ms. Twombly and indicated that he wanted to "help and support her so she could reverse these trends." *Id.* at 6-7. Mr. Gupta suggested that Ms. Twombly read a book entitled *Radical Candor*[2] to "facilitate sparking a discussion about her performance in a productive way." *Id.* at 7.

A few weeks later, JWU's Nondiscrimination Coordinator informed Mr. Gupta that Ms. Twombly had filed a complaint against him, alleging that he had

---

[2] Kim Scott, *Radical Candor: Be a Kick-Ass Boss Without Losing Your Humanity* (1st ed. 2017).

3

discriminated against and had created a hostile work environment for women. *Id.* JWU launched an investigation, but University officials later told Mr. Gupta that there was no evidence of wrongdoing on his part as it related to Ms. Twombly's complaint. *Id.* at 7-8. JWU's Human Resources department also later informed Mr. Gupta that "[t]he university did not find any evidence of any gender-based hostile workplace harassment and gender-based discrimination or any violation of the university's prohibited discrimination and harassment (including Sexual Harassment) policy." *Id.* at 13. Nevertheless, JWU asked Mr. Gupta to refrain from discussing, documenting, or bringing up any performance concerns regarding Ms. Twombly. *Id.* at 8.

Following this incident, Mr. Gupta was called into a meeting at which University officials informed him that they had arranged for him to work with an "executive coach" named Harry Hutson, who would help him address his communication skills. *Id.* at 8, 10. They also notified him of a reporting change, explaining that Ms. Twombly would temporarily report to Joseph Greene, JWU's Vice-Chancellor of Finance & Administration and Mr. Gupta's supervisor, instead of Mr. Gupta himself. *Id.* at 9. Finally, they told Mr. Gupta that both Mr. Hutson and Mr. Greene would begin attending the EM team's weekly meetings, which Mr. Gupta led. *Id.*

By January 2024, University officials told Mr. Gupta that the reporting changes would in fact be permanent. *Id.* at 11. Mr. Gupta alleges that Mr. Greene communicated to him that JWU wanted to keep both Mr. Gupta and Ms. Twombly,

4

but that "[Mr.] Gupta was going to retire and [Ms.] Twombly was younger." *Id.* On January 29, 2024, Mr. Greene announced to the EM team that, going forward, their department would be split into two divisions: Ms. Twombly would lead domestic Undergraduate enrollment as Vice-President of Domestic EM, and Mr. Gupta would lead the "all other" enrollments as Vice-President of International & Graduate Enrollment ("VPIGE"). *Id.* at 11, 15. According to Mr. Gupta, Ms. Twombly's new job responsibilities represented about 90% of those previously held by Mr. Gupta in his prior role as VPEM. *Id.* at 15.

JWU then set new goals for its Fall 2024 enrollment cycle. It was established that Ms. Twombly would work to increase Undergraduate enrollments from 1,700 new students to as many as 3,000 new students, but that it would aim for a more conservative goal of 1,900 new students. *Id.* at 11-12. By contrast, Mr. Gupta was expected to increase International and Graduate enrollments from 53 to 85 new students. *Id.* at 12.

On March 5, 2024, Mr. Gupta filed a discrimination complaint of his own with JWU's Board of Trustees in which he questioned whether the University had adequately investigated Ms. Twombly's complaint against him as a violation of JWU's policy against filing "knowingly false complaints." *Id.* at 14. James Hance, the Chairman of the Board, later issued a letter to Mr. Gupta, indicating that he had "determined that there is no evidence of any unlawful discrimination against [Mr. Gupta] or any violation of university policy." *Id.* Mr. Hance observed that, after

5

having reviewed the relevant evidence, he was "convinced that those involved behaved appropriately and fairly towards [Mr. Gupta]." *Id.*

In the meantime, Mr. Gupta worried that his new VPIGE position was "a set-up for failure." *Id.* He viewed the International Admissions department as one in "shambles" with an insufficient number of employees to staff it, so he requested that JWU permit him to hire additional employees. *Id.* Mr. Gupta specifically sought permission to transfer Ms. Torres from JWU's culinary enrollment program to his team. *Id.* Though this request was initially met with some resistance by the University, Mr. Greene eventually authorized the hiring of Ms. Torres as Director of International enrollment. *Id.* at 14-16.

Mr. Gupta alleges that the delay in hiring Ms. Torres resulted in a considerable setback for the International and Graduate team. *Id.* at 16. Though most students are expected to submit non-refundable deposits by May 1st, thereby confirming their intent to enroll in a particular university, Mr. Gupta asserts that he and his new team were unable to begin their work in earnest until mid-June 2024. *Id.* at 15-16. He also avers that, during this period, the U.S. State Department "seriously slow[ed] down the student visa process and reduc[ed] the numbers of such visas being issued" to international students. *Id.* at 16. Because of these circumstances, Mr. Gupta claims that he was "again set up to fail," and that "[e]veryone was already fully aware that International was most likely not going to meet the goal of 85 enrollments." *Id.* at 16.

On October 1, 2024, Mr. Greene and Diane D'Ambra, JWU's Vice-President of Human Resources, called Mr. Gupta in for a meeting, during which he was fired. *Id.* According to Mr. Gupta, Mr. Greene proffered three reasons for his termination. First, he indicated that separating the Undergraduate and International enrollment programs had not worked out, and that the two programs would be reconsolidated with Mr. Gupta's position being eliminated effective immediately. *Id.* Second, he told Mr. Gupta that he had not achieved JWU's International and Graduate enrollment goals. *Id.* Third, he faulted Mr. Gupta for failing to give satisfactory responses to questions Mr. Greene had posed to him over email, though Mr. Gupta avers that no such issue had been previously brought to his attention. *Id.* at 17.

Mr. Gupta states that three other JWU employees were let go, including two of the individuals he had recruited from the Undergraduate enrollment team to join his International enrollment team. *Id.* He adds that one of the individuals let go was Ms. Torres, the only other person of color in the original EM team. *Id.*

As for Ms. Twombly, Mr. Gupta asserts that she failed to meet her Fall 2024 goal of enrolling 1,900 new undergraduate students, and that only 1,722 new students enrolled at JWU during that period. *Id.* Mr. Gupta claims that this number was presented as a success to be attributed to Ms. Twombly, but that the real credit should have gone to Ms. Torres, who was responsible for growing the University's culinary program by 11%. *Id.*

Mr. Gupta went on to file this lawsuit on October 15, 2025, alleging that JWU retaliated against him and subjected him to "a number of discriminatory actions

based upon his race, color, national origin, sex and age." *Id.* at 18. JWU denies these claims and has moved to dismiss Mr. Gupta's lawsuit. *See* ECF No. 6.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Plausible, of course, means something more than merely possible." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012).

To determine whether a complaint states a facially plausible legal claim, a court generally undertakes a two-step inquiry. First, the court "sift[s] through the averments in the complaint," and "separat[es] conclusory legal allegations (which may be disregarded) from allegations of fact (which must be credited)." *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 53 (1st Cir. 2013) (citing *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)). Next, the court determines whether the remaining factual content "gives rise to a plausible claim to relief." *Id.* (citing *Morales-Cruz*, 676 F.3d at 224).

8

## III.    DISCUSSION

### A.    Discrimination Claims

Mr. Gupta alleges that JWU discriminated against him on the basis of his race, color, sex, national origin, and age.  He brings claims under both federal and state law: (1) Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; (2) the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*; (3) the Rhode Island Civil Rights Act ("RICRA"), R.I. Gen. Laws § 42-112-1 *et seq.*; (4) the Rhode Island Fair Employment Practices Act ("FEPA"), R.I. Gen. Laws § 28-5-1 *et seq.*; and (5) the Rhode Island Whistleblowers' Protection Act ("WPA"), R.I. Gen. Laws § 28-50-1 *et seq.*  ECF No. 1 at 19-23.

As relevant here, Title VII, RICRA, and FEPA each prohibit employers from discriminating against their employees on the basis of their race, color, sex, or national origin.[3]  *See* 42 U.S.C. § 2000e–2(a)(1) (relating to Title VII claims); R.I. Gen. Laws § 42-112-1(a) (relating to RICRA claims); R.I. Gen. Laws § 28-5-7(1)(i) (relating to FEPA claims).  Likewise, the ADEA, RICRA, and FEPA each prohibit employment discrimination on the basis of age.[4]  *See* 29 U.S.C. § 623 (relating to ADEA claims); R.I. Gen. Laws § 42-112-1(a) (relating to RICRA claims); R.I. Gen. Laws § 28-5-7(1)(i) (relating to FEPA claims).

---

[3] RICRA and FEPA both refer to the claim as discrimination on the basis of "country of ancestral origin" as opposed to discrimination on the basis of "national origin."  R.I. Gen. Laws § 42-112-1(a); R.I. Gen. Laws § 28-5-7(1)(i).

[4] Under federal law, an employee can be discriminated against on the basis of age if they are at least 40 years of age.  *See* 29 U.S.C. § 631(a) ("The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age.").

9

It is "routine practice" for courts to analyze these federal and state claims together. *Ferro v. R.I. Dep't of Transp. ex rel. Lewis*, 2 F. Supp. 3d 150, 157 (D.R.I. 2014); *see also Ferreira v. Child & Fam. Servs.*, 222 A.3d 69, 77 (R.I. 2019) ("This Court has also previously adopted the legal framework employed by the federal courts when considering these claims."); *Serapion v. Martinez*, 119 F.3d 982, 985 (1st Cir. 1997) ("We regard Title VII [and the] ADEA . . . as standing *in pari passu*[5] and endorse the practice of treating judicial precedents interpreting one such statute as instructive in decisions involving another.").

The primary basis for Mr. Gupta's discrimination claim is that, when he—a then 67-year-old male of color of Indian national origin—was reassigned to the position of VPIGE and later terminated from that position, his employer treated him differently from Ms. Twombly—a younger, white, American female. Mr. Gupta's discrimination claim is a disparate-treatment claim—that is, a claim alleging that "an employer has treated [a] particular person less favorably than others because of a protected trait." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (internal citations and quotations omitted).

At this stage, the evidence that Mr. Gupta relies on for his discrimination claim is circumstantial.[6] In the absence of direct evidence of discrimination, this Court

---

[5] *In pari passu* is a Latin phrase meaning "at an equal rate or pace." *Pari Passu*, Merriam-Webster, https://www.merriam-webster.com/dictionary/pari%20passu [https://perma.cc/L68F-9QHY] (last visited Mar. 24, 2026).

[6] Mr. Gupta states in his briefing that "[w]hether this is a direct evidence case is yet to be decided." ECF No. 9 at 39. He points to two comments that he alleges tells the Court "something about motive": (1) Ms. Bernardo-Sousa telling Ms. Runey

applies the familiar burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to disparate-treatment claims. *See Waleyko v. Del Toro*, 719 F. Supp. 3d 184, 189 (D.R.I. 2024), *aff'd sub nom., Waleyko v. Phelan*, 146 F.4th 89 (1st Cir. 2025); *see also Jerez v. R.I. Airport Corp.*, No. 1:25-cv-00269-MSM-PAS, 2025 WL 3079158, at *2 (D.R.I. Nov. 4, 2025).

Under the *McDonnell Douglas* framework, the plaintiff must first make out a prima facie case of discrimination, which gives rise to an inference of discrimination.[7] *Waleyko*, 719 F. Supp. 3d at 189 (citing *Kosereis v. Rhode Island*, 331 F.3d 207, 212 (1st Cir. 2003)). To prove a prima facie disparate-treatment claim, the plaintiff must show that: (1) "[he] was a member of a protected class"; (2) "[he] was qualified for the

---

that "she was concerned about putting [Mr.] Gupta in [the VPEM] position as a male in the '#Me Too' movement" and that "Indian men do not respect women"; and (2) Mr. Greene telling Mr. Gupta that "JWU wanted to keep both [Mr.] Gupta and [Ms.] Twombly, but [Mr.] Gupta was going to retire and [Ms.] Twombly was younger." ECF No. 1 at 3, 11; *see also* ECF No. 9 at 39.

This is not exactly "smoking gun" evidence by which to prove JWU's discriminatory motivations, *see Arroyo-Audifred v. Verizon Wireless, Inc.*, 527 F.3d 215, 218-19 (1st Cir. 2008), but it is not entirely irrelevant either. For now, the Court will proceed under the *McDonnell Douglas* framework with the understanding that perhaps more context will bear out JWU's motivations in the future. *See Velez v. Thermo King de P.R., Inc.*, 585 F.3d 441, 446-47 (1st Cir. 2009) (holding that plaintiffs who do not have "smoking gun" evidence may nonetheless prove their cases through the use of the *McDonnell Douglas* burden-shifting framework).

[7] Once a prima facie case is established, the burden shifts to the employer to state a legitimate, nondiscriminatory reason for the adverse employment action. *Kosereis v. Rhode Island*, 331 F.3d 207, 212 (1st Cir. 2003). In turn, the plaintiff then must show that the employer's stated reason is a pretext for discrimination. *Id.* The *McDonnell Douglas* framework is typically analyzed at the summary judgment stage. "On a motion to dismiss, the Court looks to the complaint's allegations to ensure that they are not conclusory and allege facts that give 'rise to an inference of discriminatory animus.'" *Waleyko*, 719 F. Supp. 3d at 189 n.6 (quoting *Johnson v. Gen. Elec.*, 840 F.2d 132, 138 (1st Cir. 1988)).

job"; (3) "[he] suffered an adverse employment action"; and (4) "that the adverse employment action transpired under circumstances giving rise to an inference of discrimination." *Ripoli v. R.I. Dep't of Hum. Servs.*, 123 F.4th 565, 571-572 (1st Cir. 2024) (citing *Rinsky v. Cushman & Wakefield, Inc.*, 918 F.3d 8, 29 (1st Cir. 2019)).[8]

For the purposes of the present Motion to Dismiss, Mr. Gupta need not "plead a full prima facie case . . . ." *Vazquez-Jimenez v. Evertec Grp., LLC*, 470 F. Supp. 3d 155, 158 (D.P.R. 2020) (citing *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 54 (1st Cir. 2013); *Carris v. First Student, Inc.*, 682 F. App'x 30, 32 (2d Cir. 2017); *Wilson v. Ark. Dep't of Hum. Servs.*, 850 F.3d 368, 372 (8th Cir. 2017)). Instead, it is sufficient for him to "'give plausible support to a minimal inference of discriminatory motivation.'" *Id.* (quoting *Carris*, 682 F. App'x at 32). After all, the *McDonell Douglas* framework "is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). The framework merely serves "as a prism to shed light upon the plausibility of the claim." *Rodriguez-Reyes*, 711 F.3d at 54.

---

[8] These are the elements for a prima facie case of employment discrimination under Title VII, which differs slightly from the elements of an ADEA case. Under the ADEA, a plaintiff can make out a claim for discriminatory firing if he can "show that: (1) he was at least 40 years old at the time he was fired; 2) he was qualified for the position he had held; 3) he was fired, and 4) the employer subsequently filled the position, demonstrating a continuing need for the plaintiff's services." *Velez*, 585 F.3d at 447; *see also Cocuzzo v. Trader Joe's E. Inc.*, 121 F.4th 924, 931 (1st Cir. 2024). These elements are similar enough such that the Court will treat them together for the purposes of its analysis. *See Serapion*, 119 F.3d at 985 ("We regard Title VII [and the] ADEA . . . as standing *in pari passu* and endorse the practice of treating judicial precedents interpreting one such statute as instructive in decisions involving another.").

Here, accepting the factual allegations in his Complaint as true, Mr. Gupta has satisfied the first element of the *McDonnell Douglas* framework by stating that he is a male person of color who is of Indian national origin and who is over the age of forty. ECF No. 1 at 2.  He has also met the third element by demonstrating that his former employer, JWU, took adverse employment actions against him by reassigning him to a new position and then subsequently terminating him from that position.  *Id.*; *see Morales-Vallellanes v. Potter*, 605 F.3d 27, 35 (1st Cir. 2010) (holding that an adverse employment action "typically involves discrete changes in the terms of employment," including firing and reassignment with significantly different responsibilities).

The second and fourth elements are closer calls.  In its motion, JWU argues that Mr. Gupta cannot meet the second element because he fails to plead that he "adequately performed his job." ECF No. 6 at 23.  JWU points to Mr. Gupta's failure to achieve the University's Fall 2024 International and Graduate enrollment goals, as well as the "multiple complaints by employees that [Mr. Gupta's] 'style of communication' caused them to 'experience[ ] discomfort [and] fear.'" *Id.* (quoting ECF No. 6-1 at 2).

Even if the Court were to accept JWU's arguments as true, it cannot do so at the pleading stage.  The First Circuit has cautioned against "erroneously accept[ing] for the purposes of the prima facie analysis [the employer's] stated reason for firing [the employee] as proof that he was not qualified for [his] job." *Velez v. Thermo King de P.R., Inc.*, 585 F.3d 441, 448 (1st Cir. 2009).  The Court may of course consider these arguments once the burden has shifted to JWU to provide a "nondiscriminatory

13

reason for taking an adverse employment action . . . ." *Id.* (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003)).   However, those are arguments best saved for a motion for summary judgment when the Court reviews the evidence before it and considers whether the plaintiff has fully satisfied their requirements under the *McDonnell Douglas* framework.

For now, it suffices for Mr. Gupta to "'tender[ ] some evidence which, if believed, prove[ ] that he was doing his chores proficiently.'"  *Velez*, 585 F.3d at 449 (quoting *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1335 (1st Cir. 1988)).  He has done just that.  JWU promoted him from his position as CIO and, over the next five years or so, he served in various EM roles where he supervised hundreds of employees, managed a multi-million-dollar budget, and oversaw a key revenue stream for the University.  *See* ECF No. 1 at 2-4.  Though his department experienced some difficulties and he did not meet all the goals that were expected of him, Mr. Gupta did at times deliver enrollment growth for the University.  *See id.* at 4.  Mr. Gupta has therefore shown that he at least performed his job duties competently, which is all that is required of him at this initial stage.

As for the fourth element, the First Circuit has generally required a plaintiff to put forth "some evidence of a causal connection between [his] membership in a protected class and the adverse employment action."  *Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 70 (1st Cir. 2011).  This element can be satisfied by, among other things, showing that the plaintiff was subjected to different treatment as compared to a similarly situated individual.  *See Ripoli*, 123 F.4th at 578.  This is referred to as

comparator evidence, which looks to whether "the plaintiff's case and the comparison cases that he advances . . . closely resemble one another in respect to relevant facts and circumstances." *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999); *see also Ripoli*, 123 F.4th at 578.[9]

"When evaluating such comparators, 'reasonableness is the touchstone.'" *Diaz v. City of Somerville*, 59 F.4th 24, 32 (1st Cir. 2023) (quoting *Conward*, 171 F.3d at 20). "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Conward*, 171 F.3d at 20 (quoting *Dartmouth Rev. v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989)). "Exact correlation is neither likely nor necessary, but the cases must be fair congeners." *Dartmouth Rev.*, 889 F.2d at 19. "In other words, apples should be compared with apples." *Id.*

Here, the comparator evidence that Mr. Gupta offers to raise an inference of employment discrimination is that, when he—a then 67-year-old male of color of Indian national origin—was reassigned to a new position and later terminated from

---

[9] Generally, the place to evaluate comparators is in the third step of the *McDonnell Douglas* analysis, not the first. *Cham v. Station Operators, Inc.*, 685 F.3d 87, 94 n.4 (1st Cir. 2012) ("'The time to consider comparative evidence in a disparate treatment case is at the third step of the burden-shifting ritual, when the need arises to test the pretextuality vel non of the employer's articulated reason for having acted adversely to the plaintiff's interests,' as opposed to as part of a plaintiff's prima facie case." (quoting *Kosereis*, 331 F.3d at 213)). The Court will, however, consider Mr. Gupta's comparator evidence "in order to evaluate the fourth element of the prima facie case to ensure that he can plausibly raise an inference of discrimination." *Waleyko*, 719 F. Supp. 3d at 189 n.7.

that position, JWU treated him differently from Ms. Twombly—a younger, white, American female.  ECF No. 1 at 18.

The Court finds that Mr. Gupta has pleaded sufficient facts to show that Ms. Twombly is an apt comparator.  To start, both individuals worked in JWU's EM department. ECF No. 1 at 5.  Though Mr. Gupta initially hired Ms. Twombly to serve as his "second in command," both individuals would soon directly report to the same supervisor, Mr. Greene.  *Id.* at 9, 11.  Both of them were impacted by JWU's reorganization of the EM department.  *Id.* at 11.  Then, with this reorganization in place, both individuals failed to meet their respective Fall 2024 enrollment goals.  *Id.* at 16, 17.  However, JWU terminated Mr. Gupta and eliminated his position entirely, whereas the University kept Ms. Twombly and gave her the responsibilities associated with Mr. Gupta's former role.  *Id.* at 16, 17.  The First Circuit has found two individuals to be "similarly situated . . . in all relevant aspects" based on strikingly similar facts.  *See Ripoli*, 123 F.4th at 578 (finding two individuals to be similarly situated where they both worked on the same small executive team, both reported directly to the same supervisor, and both were impacted by a departmental reorganization, but the first individual's position was eliminated, and the second individual took over some of the responsibilities of the first).  Thus, at this initial stage, Mr. Gupta has satisfied the fourth element.

In sum, Mr. Gupta has plausibly alleged sufficient facts to raise an inference of discrimination in his disparate-treatment claim.  The Court therefore DENIES JWU's Motion to Dismiss Mr. Gupta's discrimination claim.

### B.   Retaliation

Mr. Gupta also alleges that JWU retaliated against him in violation of Title VII, the ADEA, FEPA, RICRA, and the WPA.  ECF No. 1 at 23-25.  These statutes prohibit employers from retaliating against employees for "opposing" any unlawful employment practice.  *See* 42 U.S.C. § 2000e-3(a) (relating to Title VII claims); 29 U.S.C. § 621 *et seq.* (relating to ADEA claims); R.I. Gen. Laws § 28-5-7(5) (relating to FEPA claims); R.I. Gen. Laws § 42-112-1 *et seq.* (relating to RICRA claims); R.I. Gen. Laws § 28-50-3 (relating to WPA claims).

As with discrimination claims, the *McDonnell Douglas* burden-shifting framework applies to retaliation claims where the plaintiff lacks direct evidence.  *See Carvalho v. Santander Bank, N.A.*, 573 F. Supp. 3d 632, 645 (D.R.I. 2021) (citing *Gerald v. Univ. of P.R.*, 707 F.3d 7, 24 (1st Cir. 2013)); *see also Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 827 (1st Cir. 1991).

The federal and state statutes under which Mr. Gupta brings his retaliation claims each require him to establish the same three elements in order to make out a prima facie case.  *See, e.g., Goodwin v. UTGR, Inc.*, 768 F. Supp. 3d 322, 338 n.7 (D.R.I. 2024) (describing Title VII, FEPA, and WPA retaliation claims); *McElroy v. Fid. Invs. Institutional Servs. Co.*, 298 F. Supp. 3d 357, 366 (D.R.I. 2018) (describing Title VII, FEPA, and RICRA retaliation claims); *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 95 n.12 (1st Cir. 2018) (noting that "the ADEA's anti-retaliation provision mirrors the language found in Title VII").

The plaintiff "must show that '(1) [he] engaged in protected activity; (2) [he] suffered some materially adverse action; and (3) the adverse action was causally linked to [his] protected activity.'" *Stratton v. Bentley Univ.*, 113 F.4th 25, 41-42 (1st Cir. 2024) (quoting *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 81 (1st Cir. 2007)). Once again, the plaintiff "need not establish all elements of the prima facie case in their complaint. They must simply allege facts that give rise to a plausible inference that retaliation occurred." *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 276-77 (1st Cir. 2022) (citing *Garayalde-Rijos v. Mun. of Carolina*, 747 F.3d 15, 24 (1st Cir. 2014)).

Here, Mr. Gupta asserts that he engaged in protected conduct when he filed a discrimination complaint with the JWU Board of Trustees on March 5, 2024. ECF No. 1 at 14; *see also* ECF No. 9 at 52. There is no question that filing a discrimination complaint with an employer constitutes "protected conduct." *See Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 175-76 (1st Cir. 2015). As such, Mr. Gupta has satisfied the first element of his retaliation claim.

With regard to the second element, Mr. Gupta avers that JWU subjected him to two separate adverse employment actions. First, Mr. Gupta points to JWU's January 29, 2024 reorganization of the EM department that resulted in Mr. Gupta's reassignment from his role as VPEM to a newly created VPIGE position. ECF No. 1 at 11; *see also* ECF No. 9 at 3. Second, Mr. Gupta cites his subsequent termination by JWU on October 1, 2024. ECF No. 1 at 16; *see also* ECF No. 9 at 52.

18

In its motion, JWU primarily attacks the third element of Mr. Gupta's retaliation claim. JWU argues that Mr. Gupta has failed to plead sufficient facts that would allow the Court to infer causation between Mr. Gupta's protected conduct (i.e., the filing of the discrimination complaint) and Mr. Gupta's asserted adverse employment actions (i.e., his job reassignment and his subsequent termination). ECF No. 6 at 39-41. According to JWU, "the alleged adverse employment actions had commenced before [Mr. Gupta's] alleged retaliation, which is why he made the Board Complaint in the first place." *Id.* at 40.

JWU is at least partially correct. A retaliation claim requires the plaintiff to show that the retaliatory action occurred *after* the protected activity. *See Quiles-Quiles v. Henderson*, 439 F.3d 1, 8 (1st Cir. 2006); *see also Young v. Brennan*, No. 16-12001-FDS, 2017 WL 1843696, at *6 (D. Mass. May 8, 2017) (dismissing Title VII retaliation claim because "plaintiff's discharge occurred prior to the protected activity"); *Saunders v. McDonough*, No. 21-10106-MBB, 2021 WL 4847562, at *8 (D. Mass. Oct. 18, 2021) ("The causation element is met only when the protected activity precedes the personnel action or actions.").

As such, Mr. Gupta's reassignment from his VPEM role to his VPIGE role cannot serve as the basis for his retaliation claim. Because the reassignment occurred prior to the filing of the discrimination complaint, Mr. Gupta fails to state a plausible claim for retaliation. *See Quiles-Quiles*, 439 F.3d at 8; *Young*, 2017 WL

19

1843696, at *6; *Saunders*, 2021 WL 4847562, at *8. This part of Mr. Gupta's Complaint is therefore DISMISSED.[10]

As for Mr. Gupta's termination by JWU, there is no clearer example of an "adverse employment action" in the retaliation context. *See Morales-Vallellanes*, 605 F.3d at 36 (quoting *Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008)). What is more, the termination occurred *after* Mr. Gupta filed his discrimination complaint, which means that this claim does not suffer from the same cart-before-the-horse problem that befell Mr. Gupta's reassignment claim.

Nonetheless, JWU contends that this claim must also fail because the time between the filing of Mr. Gupta's complaint and his termination is approximately seven months. ECF No. 6 at 40. JWU argues that "this period of time—between the alleged protected activity and adverse action—does not permit an inference of retaliatory intent." *Id.*

Of course, the close "temporal proximity" between protected conduct and an adverse employment action is one way to establish the causation prong of a prima facie retaliation claim—but it is not the *only* way. *Garayalde-Rijos*, 747 F.3d at 25; *see also Trainor v. HEI Hospitality, LLC*, 699 F.3d 19, 28 (1st Cir. 2012) (treating

---

[10] Though Mr. Gupta's reassignment cannot serve as an adverse action for the purposes of his retaliation claim, it can still serve as an adverse action in his discrimination claim. This is so because what constitutes an adverse action in the retaliation context differs from what constitutes an adverse action in the discrimination context. *See, e.g.*, *Shervin v. Partners Healthcare Sys., Inc.*, 804 F.3d 23, 49-50 (1st Cir. 2015) (recognizing that adverse actions in the retaliation context differ from adverse actions in the discrimination context because, among other things, retaliation claims encompass broader conduct).

"temporal proximity" as just one factor, "reinforced by other evidence," that supported a jury verdict of retaliation).  The First Circuit has specifically cautioned against relying on temporal proximity as the sole basis for dismissing a complaint because the temporal-proximity analysis is more relevant at the summary judgment stage. *See Garayalde-Rijos*, 747 F.3d at 25 ("'[T]emporal proximity' is merely one factor relevant to causation and usually only later in the proceedings, for example at summary judgment.").

Though it did not rule out that "some pleadings may allege a temporal gap so attenuated as not to meet the plausibility standard for surviving motions to dismiss," the First Circuit recognized that a five-month period between the protected conduct and the adverse action "is a far cry from that." *Id.*  It follows that the seven months that elapsed between the filing of Mr. Gupta's discrimination complaint and his termination do not justify dismissing Mr. Gupta's retaliation claim, at least at this initial stage.

Mr. Gupta can still otherwise "'succeed on a retaliation claim despite a lack of proximity' between the protected conduct and the adverse action." *Román v. Hyannis Air Serv., Inc.*, 156 F.4th 18, 27 (1st Cir. 2025) (quoting *Soni v. Wespiser*, 404 F. Supp. 3d 323, 333 (D. Mass. 2019)).  "'So long as the plaintiff can link the adverse action to the protected activity sufficient to create an inference to support a causal connection, the passage of time in and of itself is not fatal to his or her retaliation claim.'" *Id.* (quoting *Saxena v. Univ. of Mass. Med. Sch.*, 442 F. Supp. 3d 395, 404 (D. Mass. 2020)).

21

"When the plaintiff does not rely on mere temporal proximity alone to establish causation," courts may consider "the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Id.* (internal citations and quotations omitted). Courts may also consider "[e]vidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action can be sufficient to show a causal connection." *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003); *see also Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) ("The causal connection between the protected activity and the adverse employment action can be established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct case . . . .").

In this case, Mr. Gupta has pleaded sufficient facts to satisfy the third element of his retaliation claim. As mentioned, Ms. Twombly—a similarly situated employee—failed to meet JWU's enrollment goals, just as Mr. Gupta did. However, JWU fired Mr. Gupta, whereas Ms. Twombly was retained and given Mr. Gupta's former job responsibilities. This evidence of disparate treatment is sufficient to show a causal connection. *See Che*, 342 F.3d at 38; *Sumner*, 899 F.2d at 209. Moreover, there seems to be an inconsistency in at least one of the proffered reasons that Mr. Greene provided as a basis for terminating Mr. Gupta's employment. Mr. Greene

22

specifically faulted Mr. Gupta for failing to give satisfactory responses to questions he posed to him over email, but Mr. Gupta insists that no such issue had been previously brought to his attention.  ECF No. 1 at 16-17.  This apparent inconsistency also supports a finding of causation.  *See Román*, 156 F.4th at 27.

The Court is therefore satisfied that Mr. Gupta has pleaded sufficient facts to make out his retaliation claim.  Accordingly, JWU's Motion to Dismiss Mr. Gupta's retaliation claim on the basis of his termination is DENIED.

## IV.   CONCLUSION

For the following reasons, the Court GRANTS IN PART and DENIES IN PART JWU's Motion to Dismiss.  ECF No. 6.  Mr. Gupta can proceed with his discrimination claim.  With respect to Mr. Gupta's claim that JWU subjected him to retaliation when he was reassigned from his VPEM role to his VPIGE role, this claim fails because the asserted adverse employment action occurred prior to Mr. Gupta's protected activity.  Nevertheless, Mr. Gupta may proceed with his other retaliation claim—namely, that JWU retaliated against him by terminating his employment.

IT IS SO ORDERED.

*s/John J. McConnell, Jr.*

_____
JOHN J. MCCONNELL, JR.
Chief Judge
United States District Court

March 30, 2026

23